THE UNITED STATES

*vs.*

GEORGE A. GARDINER.

CRIMINAL COURT, JUDGE CRAWFORD.

DECIDED MAY 18, 1853.

*Indictment for False Swearing.*

1. It is not necessary in a case of perjury or false swearing that there should be positive evidence that the paper was sworn to by the prisoner; it may be proved by circumstantial evidence.

2. Papers filed by the prisoner to sustain the allegations contained in the original paper, if they tend to establish the charge made in the indictment, as to guilty knowledge, will be admitted in evidence.

3. Authenticated public documents, giving account of all the mines and all the abandoned mines in the State of Luis Potosi, are not evidence to prove that a certain mine did not exist.

4. A witness who was sent by the United States to Mexico for the purpose of getting a knowledge of the handwriting and seals of certain official persons, will not be permitted to testify as to his knowledge of the handwriting of the officers he saw make their signatures and the impression of the seals; the danger of concocting evidence is too great.

5. A foreign law, and the practice under the law, may be proved by one acquainted with the law and the practice under it.

6. Certain letters were submitted by the U. S. from C. Gardiner, brother of the defendant, a witness for said defendant, who

neither admitted nor denied them to be his handwriting. A witness for the U. S. was called who believed they were in the handwriting of the witness for the defendant.

Held that the letters written after the crime was committed cannot be given in evidence as the act of a confederate; and that a witness cannot be called to prove handwriting to contradict another who has neither admitted nor denied that the letters were in his handwriting.

7. Acts or declaration of a witness, who was assumed to be a guilty agent, but made not in forbearance of the purposes of the crime for which the defendant stands accused, cannot effect the defendant directly.

8. Evidence in rebuttal must bear directly or indirectly upon the subject matter of defence, and ought not to consist of new matter unconnected with the defence.

PHILIP R. FENDALL, United States District Attorney, and HENRY MAY, Esqs., for the United States.

JOSEPH H. BRADLEY and JAMES M. CARLISLE, of Washington, and B. F. PERRY, of South Carolina, Esqs., for the defendant.

It appears by the fourteenth and fifteenth articles of the treaty of Gaudalupe Hidalgo, the United States discharged Mexico from all claims of whatever amount, which citizens of the United States had against the republic of Mexico, and which arose prior to the date of the treaty; and they undertook to make satisfaction of the same, to any amount not exceeding three and one quarter millions of dollars. The Act of March 3rd, 1849, was passed to carry into effect these treaty stipulations. It established a board of three commissioners, with a secretary and clerk, who were, during the two years to which the existence of the commission was limited, to receive and adjudicate upon all claims presented to them arising under the treaty.

Before these commissioners in session at Washington, Dr. George A. Gardiner appeared, and presented his claim by a memorial and an affidavit, accompanied by other affidavits, substantiating the statements in the memorial.

The indictment sets out the memorial and affidavit, with the usual innuendoes, and then alleges: " That the said Gardiner swore falsely, maliciously, wickedly, wilfully, knowingly and corruptly before the said justice, touching the expenditure of public money, and in support of a claim against

the United States; and that the said oath was material in order to enable the said Gardiner to obtain from the commissioners an award, touching the expenditure of public money, and in favor of the said claim of the said Gardiner, and from the United States a payment of the said claim.

The principal allegations in the memorial were then negatived and set out to be false, and were known to be false by Gardiner at the time they were sworn to.

The indictment was under the following statute:

SEC. 3. That if any person shall swear or affirm falsely, touching the expenditure of public money, or in support of any claim against the United States, he or she shall, upon conviction thereof, suffer as for willful and corrupt perjury. (3 Stat. L., 771) March 1st, 1823.

March 14, 1853.

During the trial Mr. May, on the part of the United States, offered to read the memorial to the jury.

Mr. Carlisle objected; citing Brady's case, 1 Leach 327, 330. Mr. Fendall cited the case of Beute,[1] convicted in this Court of false swearing.

The Court said he would read the decision of the Court in the case of Beute. It was tried in the June term of the Court, 1851. The decision of the Court was read. No question was raised as to the admissibility of the affidavit, but one was raised as to the guilty knowledge of the accused of the falsity of the statements in the oath.

Mr. Fendall cited 3 Starkie on Ev. 1139; case in 2 Burrows, 1189;[2] Warden's case, 11 Metcalf, Mass., 406; Silver *vs.* The State, 17 Ohio, 365; Price's case 6 East, 323.

Mr. May says no proposition could be more clear that that paper was admissible, citing Cole *vs.* Hebb, 7 Gill and Johnson, 20. 1st. Shower's, 327; Rex *vs.* Spencer Ryan & Moody, 197; Rex *vs.* Benson, 2 Campbell, 508; Bull Nisi Prius, 239; Phillips on Ev., 291, 454; Roscoe's Crim. Ev., 89, 190; Starkie on Ev., 836; Wheeler's Am. Com. Law, 483; Greenleaf on Ev., 520.

---

[1] Page 49 of this volume.
[2] Rex *vs.* Norris.

Mr. Bradley replied for the defence, and in support of the objection citing 3 Starkie on Ev. 1130; and 2d Howard, 373.

The Court referred to the testimony of Justice Myer, and to the fact that the paper could not have been withdrawn; and upon the evidence said: I thought it my duty to overrule the evidence (memorial) at that time, because it was a *non sequitar*, and I said then that some recognition by defendant of the paper was necessary. Afterwards it was testified by Johnston, who was Secretary to the Board (of Commissioners,) that this paper was one of those in relation to the claim of Dr. Gardiner; that it was filed in his office by W. Thompson, who, he said, was one of the defendant's counsel on the 29th of Nov.; that the defendant had a claim before the Board, and that it could not have been withdrawn without the authority of the Board, and that this paper was unquestionably before the Board. Then he testified that the rules shown him were those of the Board. Dr. Davis was called, said he had seen the paper before—probably a few days before the final award was made—as to the sum, because he was not appointed Secretary until the 1st of April, and the awards were made on the night of the 15th of April. To-day Mr. Evans has been called, and states that he was one of the Commissioners, and has no doubt at all that the paper was before the Board. There is no mark of his upon it, yet he is perfectly familiar with its appearance. He said further that there was no other claim of Dr. Gardiner before the Court, and no separate memorial but that one. He said further that Dr. Gardiner, either at the suggestion of the Commissioners, or the counsel of Dr. Gardiner—he did not recollect which—was called before the Board, in company with Gen. Waddy Thompson, Edward Curtis, Thomas Corwin and Robert Corwin, and perhaps Col. Allen, though he was not confident about his being present; was examined there at least one hour about his claim; was examined closely by himself and other Commissioners, and was particularly questioned about his investments, &c., to which he gave certain answers. He says furthermore that these memorials are presented sometimes without being sworn to, either from negligence or otherwise, and in such cases are returned to the parties to be corrected. It appears

furthermore that this memorial was sworn to on the 20th day of Nov., and was filed on the 29th according to the endorsement, but was *received* also on the 30th, a distinction which is a little awkward to me. Nevertheless he did recognize it, and a witness from the Treasury Department was about to prove what was admitted afterwards, namely, the receipt of this money by Dr. Gardiner or his attorney. On this point it was said the Board did not require a signature, which I think they did, or something equivalent, that is, there must be proof or a signature, or it must be signed, one or the other. There is no other mode of procedure.

This has been treated throughout as if it were a case of perjury. It is not a case of perjury. The Act of Congress creates an entirely distinct offence. It is to be punished as perjury, but the Supreme Court says distinctly, it is not perjury. The words of the law "If any person shall swear falsely, &c., (for the purpose of obtaining money from the United States) he shall suffer as for perjury." The cases cited on both sides appear to have related more to the sufficiency of the evidence than to its competency. The law is not here as it is in England, where the Judge states the evidence on each side, and in terms almost directs the verdict or takes the case from the jury. Here it would be denied, and I should hold myself bound, but think myself restricted to answer on certain points of law, founded on facts, which the jury are to believe the law applies. Such was the law in this District and in Maryland, or at least used to be—I don't know how it is now.

In this case the filing of the affidavit in this suit and the date of the oath differ, but it does not strike me that, even unexplained, that would be very material. But it is not necessary that it be put upon that footing. The jury may infer upon any facts whatever they think proper. They may infer it was a mistake, or that after the paper was filed this defect was discovered, and it was given back and corrected. That the oath was sworn to before it was "received," I suppose can hardly be doubted, for the rules say that no paper will be received unless sworn to. And the first thing the Commissioners had to look to was to see that

it was sworn to. It is further in evidence in this case that this paper was the foundation of the only claim which Dr. Gardiner had before the Board. Before that could be considered at all it was necessary that the memorial should be "received," as they call it, and not only that, it must be sworn to, otherwise it could not be received. That reduces it to a certainty, whether there was any doubt about it before or not. It is not necessary, even if this was a case of perjury, that there should be precise, positive evidence that this was sworn to by Dr. Gardiner. It may be, however, by circumstantial evidence. If circumstantial evidence is not to be received in cases of this kind it would be a great obstruction thrown in the way of the punishment of crime. This paper I am bound to believe, therefore, was recognized as Dr. Gardiner's up to the very time the claim was allowed, and under all these circumstances I am of opinion that it must go to the jury.

March 29, 1853.

Question was as to the signatures of the Governor on papers showing the mining title.

Mr. May called a witness who could not speak English, and did not know what would be done for an interpreter· There were one or two present who were competent, but they were witnesses.

The Judge said an interpreter would undoubtedly be required, and it made no difference whether he was a witness or not.

The interpreter was requested to ask the witness to look at the paper, and examine the signatures of the governor.

Mr. Bradley, to the interpreter: Don't repeat his answer yet, we object to the evidence.

Mr. Perry said he understood the object of this testimony was to show these papers to be forged.

Mr. May: That is the object.

Mr. Perry said he regarded this question as to the admissibility of this collateral evidence as one resting altogether within the jurisdiction of the Court and cited 2 Russell on Crimes, 772. That no evidence can be admitted which does not tend to prove or disprove the issue joined. In criminal

cases this rule is more strict, that the evidence must be confined to the point in issue.

Mr. May, in support of the admissibility of this evidence cited 1 Greenleaf on Ev., Sec. 52; Roscoe Crim. Ev., 83 and 87; and cases therein cited. Wheeler's Am. Com. Law, 138; Baily S. C. R., 300;[1] 2 Leigh R., 749,[2] 5 Leigh, 708;[3] Baldwins R., 519;[4] 1 Campbell R., 48; and notes and 14 Peters, 430.[5]

The Court: It is proposed to prove that the papers, the mining title, and accompanying depositions are forged.

The defendant's counsel objects to this course on various grounds.

1st. The indictment is pending and untried for the forgery of these papers.

2nd. That the alleged forgeries, if committed, were made eight months after the oath charged to be false was taken.

3rd. It was within the discretion of the Court, which should be exercised to exclude the proof offered.

I do not think the pendency of an indictment, charging the defendant with forging the papers, which is now proposed to show are false, affects the question. Doubts existed formerly on this subject, but they have been removed, and never had any good foundation. It is said to be within the discretion of the Court to admit or reject this evidence. True, but I prefer to be regulated by established rules and principles.

The fabrication of the papers, if they have been fabricated, was, as it is said, subsequent to the swearing. The argument of the United States considers it to be immaterial whether the matter offered in evidence or fact proposed to be proved to show guilty knowledge, occurred prior or subsequent to the principal fact charged. This proposition, as asserted, is too general. I have had frequent occasion to consider this question, and have a record of an opinion delivered by me at the June term 1847, in the case of the United States *vs.* Noah Leeds or Lee. This opinion contains

[1]The State *vs.* Houston.
[2]Martin *vs.* The Commonwealth.
[3]Hendrick *vs.* The Commonwealth.
[4]United States *vs.* Doebler.
[5]The United States *vs.* Wood.

the law of the question before the Court.  The possession of a counterfeit bank note or notes, at the time of the passing charged, or shortly before the passing for which he is indicted, has always been received.  If subsequent counterfeit paper is found on the defendant's person, it must be in some way connected with the principal charge, or be of the same manufacture.  This is the rule.

Here the memorial, in the making of which the false swearing is charged to have occurred, states that the accused had a mine in the State of San Luis Potosi; that was the foundation of a claim, and filed as such, subsequently the papers which the United States say are false, and offer to prove to be so, were procured to sustain the allegation in the memorial that he had such a mine, and were the means of inducing the Commissioners to augment the amount of the award, after the Commissioners had decided that the claim was valid.  Is it not then connected with the memorial, and the verification of it required by the Commission, without which the claim could not even be considered?  The memorial and proofs submitted with it were the grounds of the decree that the claim was valid for something; the mining title and accompanying depositions afterwards filed were, with other proofs, the foundation of the decree, fixing the amount due on the claim, and they were especially the means of increasing the amount previously thought of by the Commissioners. The testimony offered, if made out to the satisfaction of the jury, would tend to establish the charge made, of which one of the principal features is guilty knowledge.  It is a relation to the issue.

The case of the United States *vs.* Wood, 14 Peters, is a cogent authority on this question.

The objection is therefore overruled.

March 31, 1853.

Mr. May offered in evidence to the jury an official, authenticated public document, (one identified by the witness), dated Jan. 3, 1849, giving an account of all the mines and all the abandoned ones in the State of San Luis Potosi.

Mr. Bradley objected to the admissibility of the paper.

After arguments by the counsels, the Court delivered the following decision:

Two papers are submitted by the United States as proper to go to the jury. They are offered as printed copies of a report, in relation to mines, in the State of San Luis Potosi, made by the Governor of the State, and appended to a message of the Governor to the Legislature, and was handed in 1852, at the Government Hall, to Mr. Partridge, by the Secretary of State. One of them has this certificate.

I, the citizen Luis Guzman, Secretary of the Department of Government of the State of San Luis Potosi, certify that in this present table are named all mines existing in this State, and that neither before the formation of these statistics, nor since then to the present time has any knowledge been had of any other.

LUIS GUZMAN, *Secretary.*

{ SEAL }        SAN LUIS POTOSI, Nov. 20, 1852.

The other of these certificates is:

This report is really the one which was published during my administration, and I authenticate it with my original signature in order that it may have due effect, accordingly to the request of Mr. George W. Slocum.

JULIAN DE LOS REYES.

MEXICO, March 5, 1852.

The undersigned Minister of Foreign Affairs, certifies that the foregoing signature of his excellency Don Julian de los Reyes, who was Governor of the State of San Luis Potosi, is genuine.

JOSE F. RAMIREZ.

{ SEAL }        MEXICO, March 6, 1852.

The certificate of our late Minister to Mexico, that the signatures of Governor Reyes and Minister Ramirez are genuine, and were made in his presence March 6, 1852.

The certificate of Luis Guzman is not an authentication of the paper offered as an exemplification of the records

in the office of State, but a certificate that in this present table are named all the mines existing in that State, and that neither before the formation of these statistics, nor since then to the present time has any knowledge been had of any others.

The certificate is no better than that of any other man, in or out of office, of the facts it sets forth. It is no authentication of the paper, which if it were a report to a department of our own government, could not be received in evidence in the shape in which this paper comes. According to what is said by the Supreme Court, in Watkins vs. Holman, 14 Peters, 56.

The other paper is certified by Julian de los Reyes, after he ceased to be Governor of San Luis Potosi. He was then a private gentleman, without the power to certify to the verity or official character of any paper that might remain in the public offices of which he once had control. Is it aided by the certificate of Don Jose F. Ramirez, the Minister of Relations in the Republic of Mexico? I think not. He certifies that the signature of Julian de los Reyes, who was Governor of the State of San Luis Potosi is genuine.

And our late Minister to Mexico does not make the certificate any stronger. He states only that the signatures are of the proper handwriting of Governor Reyes and Minister Ramirez. Both of these papers are, in my judgment, altogether informal. But if they were regular and properly authenticated, I do not think they would be evidence. The mere fact of a paper being a public document does not make it evidence, if intrinsically it is not so. The Journals of the two Houses of Congress, and all matters of State, here and in England are evidence, and may be so even in criminal cases in the United States, in very few and peculiarly circumstanced cases, chiefly, if not exclusively, where the parties against whom they are sought to be used, or the act charged upon him is in some way connected with the document and not always then; in England, where men are indicted for seditious meetings and seditious libels, there has arisen frequent legal occasion for the admission of such evidence. The Journals are evidence of what each House of Congress does; that such a petition was withdrawn or presented, such a bill considered

and passed or rejected.　If a question whether a certain officer of either House was elected, and when, undoubtedly the Journal would prove it, if properly authenticated.　So, if the inquiry is, whether the President transmitted a message to Congress, and in it treated of certain subjects, the record would be evidence; but suppose a man should be charged with a crime in any department of the government, will it be urged that the statement of it in a document would be evidence to go to a jury?　Take the ten members of the British Parliament who have been lately unseated for bribery; suppose they should be, as they ought to be, indicted for the bribery, it would scarcely, I imagine, be deemed proper in that country to adduce the reports of the committee of the House of Commons, on which they were deprived of their seats, as evidence of their guilt.　I can see no difference in the principle between that case and this, except that this is the weaker of the two, for the members, it may be presumed, appeared before the committee.

An agent of the government in San Luis Potosi made a report in 1849 to his government, which is offered in evidence to show that the accused swore falsely, not because it states a certain fact, but because it does not contain one that is alleged by the defendant to exist.　This report is not unlike the geological reports that are made to most of our State governments, and transmitted with the message of the Governor to the Legislature.

If a man were indicted for obtaining money under false pretenses in saying he had a coal mine in a certain district, or if in the gold bearing States a gold mine, it would scarcely be allowed the prosecution to adduce one of these geological reports to show he had no such mine.　They are, no doubt, very convenient to the government; it may be in reference to taxation, certainly as showing the real quality and wealth of the country.　They extend knowledge and advance science, but I think those are their proper uses

The evidence is rejected.

April 1, 1853.

The United States offered to prove by Mr. Partridge that the signatures of Governor Reyes, Secretary Guzman and

Francisco Fernandez, prefect of Rio Verde, to the mining title, &c., were forgeries on the following grounds, and in the following terms.

We now offer the evidence of the witness (Mr. Partridge), as founded. 1st. On his testimony of having seen them several times sign official orders and papers in the usual course of their official duties, and which were not in any way connected with the commission. 2nd. On his knowledge derived from a correspondence between these persons and the Commissioners of whom he (the witness) was one, which took place during their visit and during its period of ten days at San Luis, in December, 1852.

After argument by the counsel as to the admissibility or inadmissibility of said evidence.

The Court says:

The modes of acquiring knowledge of handwritings are these: 1. By seeing a man write. 2. By correspondence with him, or by seeing papers frequently which the party has signed. This general statement embraces substantially the legitimate modes of acquiring knowledge of handwriting. The true manner of gaining this knowledge is in the ordinary course of business, or in the correspondence which passed between them regarding business, or in the indulgence of friendship, or in the use of papers, bank notes for instance, which the pay officer of a bank handles every day.

The fact of the knowledge of the witness being obtained lately is not regarded as entitled to influence in this case, as to which decision 19 Johnson Rep. 134,[1] is very much in point.

The person whose handwriting the offer respects are Mexican officers of high rank, whose handwriting must be extensively known. Witnesses certainly could be easily obtained who are and have been long acquainted with them, and in fact one such witness has testified.

The question is, whether the United States can send a witness to Mexico, for the purpose of getting a knowledge of the handwriting of certain official persons ?

[1] Johnson *vs.* Daverne.

Mr. Partridge did go there, and those persons wrote their names more or less frequently to acquaint him with their handwriting, besides which he says he saw them write frequently in the discharge of their official duties, and saw letters or communications sent by them to the Commissioners. The knowledge to make the evidence offered admissible must have been acquired, as Lord Brougham said, spontaneously, that is in the course of business or correspondence; and this requisite, it is argued, is to be found in this offer, because the witness saw communications from the officers, and saw them write in the ordinary discharge of business, as well as to sign their names to familiarize him with their signatures. The reason which prevailed with the Court, in excluding testimony, founded on knowledge of defendant's handwriting, acquired shortly before the trial, in Stranger *vs*. Scarle, was that the signatures might have varied from his general mode of signing, and that decision has been authorative from that day to this. But it is contended that the exclusion of this testimony has taken place only when the defendant, a party has written to qualify the witness to testify. That would obviously, no doubt, impress the mind more strongly—would most frequently occur—but I do not see that such a distinction is taken. The Court is again asked if the party writing or testifying can have any possible interest in the indictment or its result? I can see none; but this is not involved. The inquiry is, whether established principles and the danger of manufacturing testimony and making an opinion for the particular case do not exclude the evidence offered. The rule, whichever way it shall be settled, will govern not this case only, but all cases.

The witness went to the official, who was told by him or some other gentleman with him, that he desired to see his signature—that was his errand; and although he saw several communications from the official, addressed to the Commission, and saw him write at his desk in a public office at other times during a few days' visit in the city where the officer resided, he must always have seen him do so with the impression made by the signatures, if they preceded his other observations and the receipt of the several communications; or if

they followed, would more or less efface that observation, and the effect of the letters in either case would be mixed up with them. If the witness had never seen the communications referred to, or the officer write, except when he desired him to do so, that he might be qualified to speak of it on this trial, there could be no question about it; it would be exactly like Stranger *vs.* Scarle, except that the handwriting there was that of the defendant. Can it make any difference that he saw about the same time an officer write at his official desk in the ordinary discharge of business, and saw communications signed by him? I think not; for his mind would still have the image of the signatures made on request before it.

The great danger attending the admission of such evidence, the facility of concocting evidence which it would furnish, the danger of corrupt action to which it would open the door in any case in which it would become necessary to establish or to discredit handwriting, obliges me to overrule the offer.

April 2, 1853.

The United States offered to prove by Mr. Partridge, who had seen the original seal in the State Department in San Luis Potosi, and impressions made there of it, and impressions of it on papers filed in that office, and dated in 1850, that the seals on the mining titles, &c., were forgeries.

The defence objected, after argument by the counsel for the United States and the defendant.

The Court : The question is whether or not, by looking at the mining title, and from his (the witness') knowledge of these seals, he can say that the seal on the mining title is a forgery.

Mr. May: Here is the point; a seal cannot be removed, we cannot produce it, and the next best evidence of what it is is the evidence of the man who has seen it.

The Court: There is no doubt about all this, but it requires that the papers to which the seal is affixed should *per se* be in evidence. These documents are not in evidence. They cannot be received except for some legal purpose. The question is whether the document to which the seal is attached is in evidence. They are admitted not to be offered

as such in regard to their contents, and are only asked to be admitted with a view of instituting a comparison between the seals. The objections taken by the defence are twofold:

First, it is objected that these papers were obtained *post litem motam*; and secondly, that they are offered for the purpose of comparison. I do not think any further discussion on these objections is necessary. The Court decided the other day that such papers could not be admitted as evidence, because of themselves they prove nothing at all, and if admitted could only be used for the purpose of comparison, in the same way as proving handwriting by comparison. I do not think the fact of the genuineness of these papers being proven makes any difference at all. The fact that Mr. Partridge saw them taken out of the office of the Secretary of State cannot make a particle of difference. For these reasons the Court must reject the papers.

The effort of the counsel, if successful in this manner, getting in evidence as to the seal, would be but an entering wedge to admit similar testimony in regard to handwriting, and being secondary evidence, and mere heresay, he objected to it as incompetent.

The counsel for the prosecution base their argument that there is a difference between the handwriting and the seal.

In deciding this question the Court must look to general principles and rules. It would ill become the Court to impute corrupt motives to any man connected in any way with the evidence offered. I have no right to think that any such motives exist. The principle on which the decision of yesterday was made embraces this question. There is undoubtedly a difference between the uniformity of signatures, and that of seals, but the danger of concocting evidence, when the witness does to qualify himself to testify is as great in the one case as in the other. The knowledge is not derived from ordinary business transactions. Many persons must be able to testify to this seal who was on the stand a few days ago, and they are best qualified, if others are at all qualified, to speak of the seal.

The offer is overruled.

April 4, 1853.

The witness, through the interpreter, was asked by the Court if he was acquainted with the practice in the prefect's office. Does it rest upon any general law or not?

If it be regulated by public laws, and they can be got, they are the best evidence. If they cannot be got, we must take the next best evidence, that is the evidence of those who understand them.

Mr. Carlisle: If the law had been there it certainly could have been got.

Mr. Fendall contrasted the rules formerly prevailed with those now existing. He referred to the case of Baron de Bode *vs.* Reginam, in a note to Sec. 487, of 1 Greenleaf on Ev. In that note this case was cited for 10 Juris. 217, to the effect that "it is now settled in England, upon great consideration, that a foreign written law may be proved by parol evidence of a witness learned in the law of that country, without first attempting to obtain a copy of the law itself. He cited also the Sussex Peerage Case, 11; Clark & Finnelly, 116; U. S. *vs.* Certain Casks of Glassware, 4 Law Rep. 36; Farmers' and Mechanics' Bank *vs.* Ward, 4 Law Rep. 248; Hubert *vs.* Hubert, 2 Haz., 272; Middletown *vs.* Janveum, 2 Haz., 441.

Mr. Bradley cited Cowen and Hill's notes to, 2 Philips on Ev. 326, and the cases there collected.

Mr. Fendall read from 8 Adolphus and Ellis, 208 and 286;[1] after which he stated that the United States proposed to show by a practicing lawyer in Mexico what the practice in regard to mines was in San Luis Potosi, and what the duties of prefects were, which knowledge he had acquired not only from the study of the law, but also his practice as a prefect.

Mr. Redin, one of the counsel in the Kosciusko[2] case, stated at the request of the judge what its decision was.

The Court:

The law formerly was very rigid in its requirements as to proof of the laws of foreign countries. It has lately been less so. The modern decisions have admitted parol proof of such laws. The Sussex Peerage case and the Baron de Bode's case

---

[1]Baron de Bode's Case.
[2]Ennis *et al. vs.* Smith *et al.*, 14 How., 400.

are authorities for its admission. In 11 Clark & Finnelly, 118, the witness, Dr. Wiseman, proved the contents of a decree of the Council of Trent, as well as its construction. De Bode's case is stronger. Here the witness on the stand is *heritus virtute officii*, and professionally skilled too. In the cases referred to the evidence admitted went to the statute law and the decrees, decisions or adjudications on it; that is, the witness stated what the law altogether was in France. How could he intelligently state what decisions had been made on a particular statute, without stating with more or less precision what the statute itself contained?

The impression I had when this discussion was entered upon is not changed. I am of the opinion that the evidence offered is admissible.

On the calling of a witness to identify handwriting.

Mr. Chew, consular clerk of the State Department, was called to identify the handwriting of a consul.

April 18, 1853.

The Court: Mr. Robert S. Chew, a witness called by the defendant, having proved on Saturday that letters were received at the State Department from T. W. Mather, acting as vice consul at Monterey, in Mexico, in the year 1850; that these letters were acted on, and were in his charge, as Chief Clerk of the Consular Bureau, that he had no examplar of Mr. Mather's handwriting in his mind, any impression that might have been made respecting it being wholly effaced and gone from his general recollection; and that he had on last Friday evening inspected the letters so received, which did not however revive any former impression or image of the handwriting, his present capacity to speak of it arising entirely out of such inspection; it is proposed to ask him what is his belief as to the signature of Mr. Mather to a certificate produced, being or not genuine? This question is different from that heretofore offered and overruled, in relation to the signatures of certain Mexican officials. There the witness saw the officer sign his name on his (the witness') request, to enable him to testify, having seen him also about the same time write without request at his official desk, while the witness was in his office, and all this in the fall of 1852; neither is it

the same with the testimony of another clerk from the State Department, respecting the handwriting of the defendant, for there he had an image in his mind that he, too, examined the letters from which the image was derived.

The present question presents a case of letters received in 1850, but leaving no trace of the handwriting in them behind their receipt. Nothing can now, by reference and inspection be resuscitated. So that the evidence offered is precisely as if the witness had never seen the handwriting of Mr. Mather until last Friday night, for he can speak, he informs the Court, only from what he then saw. The question is' one that calls for consideration, and is by no means so plain as the counsel for the United States think it. That very learned lawyer, Roscoe, in his treatise on Criminal Evidence, says: See Roscoe's Crim. Ev., 196, 162.

I have however examined the case of Smith *vs.* Sainsbury, 5 C. & P., 196; S. C. 24, Eng. Com. L. R., 275, and find that it does not at all bear Mr. Roscoe out in the terms in which he states his position. In the case of Doc. Dem. Mudd *vs.* Suckermore, 5 Ad. and El., 703; S. C. 31 Eng., Com. L. R., 406, cited on a question similar to this, the Court of Queens Bench were equally divided. Lord Denman, C. J., and Williams, J., holding the evidence admissible, and Patterson, J., and Collridge, J., that it was not; and Mr. Phillips considers this case with ability, and contends for the admissibility of the evidence. 2 Phillips Ev., 260 *et seg*. I think however the danger of combination and corruption certainly imputable to no person in this instance, but the hazard of it on general principles must exclude the evidence offered. Good policy, in my judgment, requires its exclusion, and I do not find myself constrained to a contrary course by any reported decision that I have met with.

May 3, 1853.

The District Attorney said that the United States offered papers, letters of John C. Gardiner, on two grounds:

1st.   To contradict the witness, and

2nd.   On the ground of his being an accomplice.

Mr. Carlisle said that their objection went entirely clear of the contents of the letters. In support of his argument he

cited Paine vs. Beeston, 1 Moody and Robinson 20; Roscoe, 183; and Smith vs. Price, 8; Watts, 447; and to the decisions of the Courts of the District in the cases of Alexander, Calder, Van Ness and Camper.

The District Attorney explained the grounds of the admissibility of the papers as evidence.

1st. To contradict the witness. Citing Paine vs. Beeston 1 Moody and Robinson, 20; Long vs. Hitchcock, 9 Carrington and Paine, 619, were in conflict with the case of Crowley vs. Page, 7 Carrington and Paine, 791; 1 Greenleaf on Evidence, 462, 463, 464; 2 Phillips on evidence, 463; as to the right of the jury in certain cases to construe writing. See 1 Greenleaf Evidence, 49; 1 Starkie Evidence, 25, 3rd ed.

On the 2nd ground, that the witness is an accomplice.

Mr. May says that the precise question to be determined on this application was whether certain letters, proved to be in handwriting of the witness, are competent evidence for the consideration of the jury. Cited Crane vs. Morris, 6 Peters, 598; Carter vs. Jackson; United States vs. Wiggins; Scott vs. Lloyd, Md. Digest, 656 to 662; Davis vs. Barney; Mitchell vs. Dall; Cole vs. Hebb; 7 Gill and Johnson Reps., Bank of N. England vs. the United States Bank; 4 Phillips, on Evidence, 516, 517.

Mr. Gardiner said he relied on the cases cited by the Government to show that there is a distinction between the legal sufficiency of proof and the weight of evidence, and stated the progressive order to be: 1st. The admissibility of the evidence. 2nd. Its legal sufficiency, and these were questions for the Court. 3rd. Its weight or credit; and this was exclusively for the jury. He referred particularly to the case of Cole vs. Hebb, cited by Mr. May; and Parks vs. Ross, in the Supreme Court.

Mr. Bradley restated his proposition:

1st. The evidence is not rebutting if the witness was a confederate or agent.

2nd. The confederacy or agency must be first proved aliundi, and the proof cannot be eked out of these letters.

3rd. They are not admissible to contradict the witness.

4th. Certain of them are purely collateral.

May 6, 1853.

The Court: Several letters, dated 12th December, 1844, and from 8th May, 1851, to 8th September, 1852, having been submitted to John Charles Gardiner, a witness for the defendant in this cause, by whom they purport to have been written, and he having said that he neither admitted or denied them to be his writing, with perhaps the exception of No. 6. Col. Lorenzo Thomas was called by the United States, who testified that each of the said letters and writings marked L. T., and numbered from 1 to 15 inclusive, and the one of 1844, marked A. J. H., No. 31, were, as he believed, in the handwriting of the said J. Charles Gardiner, whereupon the United States offer the said letters and writings in evidence. To this proposition the counsel of the defendant object.

The objection, it is contended, is well founded. 1st. For that the evidence offered consists of the mere declarations of a stranger. 2nd. If offered to discredit the witness, that the proper foundation has not been laid by the United States; that there is no denial of any one of these papers being of the handwriting of the witness. 3rd. That if they are considered the acts of an accomplice they cannot be received, because not done in furtherance of the common object, but are all, except the letters of 1844, subsequent to its attainment. 4th. That they are collateral. 5th. That they are not rebutting evidence.

The United States insist upon the competency of the evidence offered: 1st. To contradict the witness. 2nd. As the acts of an accomplice. 3rd. As the acts of the agent of the defendant.

There is an indictment against the witness for the same offence, in relation to the same transaction pending in this Court.

The question presented has been very much labored, but it lies within a nutshell, and will be considered on the ground that the defendant and the witness acted together in the preparation to support the claim of the former before the Commission, and in procuring its allowance. Whether the claim be just or unjust, it belongs to the jury to decide. Assuming that they did act together, how stands the law?

It is admitted by the United States that a statement of an alleged partner in crime, being a narration of past transactions, cannot be received against his fellow, but only such declarations as accompany the transaction during the conspiracy; and this could not be denied, for the unbroken current of decisions leave no room for controverting this well established doctrine. But it is argued that the supposed conspiracy between the defendant and the witness had for its object the use of the money obtained for the claim, that the desire is as strong now as it was when the original plan was laid, and kept the conspiracy alive to this moment; and second, that the object of the witness is to get his brother out of the scrape. Suppose this to be so, I do not see how it can be connected with an original conspiracy. The purpose of this was answered; an award was made; the money was paid to the defendant, or to his Attorney in fact; the defendant had gone to Europe, and the witness was in Mexico. I presume from the date of one of the letters offered at this stage of the business there was nothing to conspire about. If a subsequent conspiracy took place in relation to the defence of the accused, it must have been concocted in the summer or fall of 1851, for the defendant was in England when the indictment now trying was found on the 17th of July, 1851, according to the evidence heretofore adduced. The indictment is for swearing in November, 1849. It was then complete, or the crime was not committed. How the acts of an accomplice, two years after the offence is charged to have been perpetrated, and months after its success was accomplished, can be lawfully used as substantive evidence against the defendant, I cannot perceive. The same point in a case not very unlike this, including even the brotherhood; the United States *vs.* White[1] was decided in 1836 by the Circuit Court of this district. The indictment was for burning the old Treasury Building. The United States offered in evidence against the defendant, Richard H. White, the admission of Henry H. White, who stands charged with the same offence in a separate indictment, evidence having been offered tend-

1 5 Cranch, C. C., 38

ing to prove that both were in the City of Washington the day preceding the burning of the Treasury Building that both went away together in the evening, and that the defendant had told Henry to say nothing of burning the Treasury. The Court (Thurston contra) refused to permit the declaration of Henry H. White, made after the supposed accomplishment of the common purpose, to be given in evidence against Richard (the defendant) in this trial, they having been indicted separately, and not charged with a conspiracy. 5 Cranch C. C. R., 457.[1] I am of opinion that the letters cannot be received in evidence as the acts or admission of a confederate, so as to affect the defendant directly.

This would seem to dispose of the next question mentioned by only one of the counsel for the United States, and not pressed by him strenuously, but mentioned, as he said, only in case the Court should not consider the witness as an accomplice, looking to the witness as agent of the defendant.

Presumptions and implications of authority as agent are in general applicable to civil cases. 2 Starkie on evidence, 34. To be a guilty agent is to be an accessory before or after the fact, or an accomplice. To be an innocent agent, is to be generally a mere conduit pipe to convey intelligence, letters, or papers, to communicate messages, without knowing what they are intended to effect. A man may make himself criminally liable by the employment of such an agency. The law goes beyond what was stated in the United States *vs.* Gooding, for not only may the agent be innocent, but in some cases it is necessary he should be so, to enable you to indict his employer or principal. In those cases, if the agent have guilty knowledge, the principal is only an accessory. Here the whole argument has gone on the assumption very much urged that the witness was a guilty agent, and as such, the Court has already said that his acts or declarations made, not in forbearance of the purpose for which this prosecution has grown, was allowed and paid, cannot effect the defendant directly.

[1]United States *vs.* White.

3.   They are offered lastly to contradict the witness.

The objection to this view of the offer is that the proper ground has not been laid for contradicting the witness. Has it?

The rule requires when you intend to contradict a witness by evidence that he has made, declarations or statements inconsistent with his testimony, that you must lay a foundation for it, by asking him as to the time, place, and person involved in the supposed contradiction.   If he admit that he has made such statements, the enquiry, so far as the evidence is concerned, is at an end; if he deny the imputed inconsistency, then it may be shown by the party desiring to weaken his testimony.   If he neither admit nor denies, or says he does not remember, you cannot contradict him, as has been decided in England and by the Circuit Court of this District, in the case of Culder's, Alexander's and Travers' wills, and by this Court, in compliance with those decisions, but against my individual judgment in Camper's Case.   To this extent the law must be regarded as settled in this District.   It is contended by the United States that the rule and these decisions do not apply to a contradiction by letters or writings.   Phillip, Russell and Greenleaf, in prescribing the rule confine it to *verbal* statements.   The Judges of England, on the trial of Queen Caroline before the House of Lords, gave it as their opinion, not that the rule applied to letters, but they could not ask the witness if he wrote a letter with such contents, or contents to the like effect, and that the proper course was to put the letter into the hands of the witness, and ask him if he wrote the letter.   If he admit it, the letter may be read at the proper time, if competent evidence.   If he deny it on principle, though the judges were not asked for their opinion in this particular, the handwriting may undoubtedly be proved *aliundi*.   If he should not admit that he did or did not write the letter, the judges said a cross-examination of the witness would not be allowed as to the contents of the letter, because the paper itself is to be produced.   How can it be introduced if the indecisive answer of the witness is conclusive?   It can only be made evidence by testimony, tending to prove its genuineness, not absolute or positive proof,

but enough to allow it to go to the jury as far as it lawfully may. The acknowledged rule in relation to verbal statements I think an injudicious one. It does not in my judgment belong, certainly not clearly or necessarily, as in case of oral declarations to letters or papers, and the Court is unwilling to extend it. I am of the opinion that the course pursued in this case was correct, and that no other preliminary inquiry than those made was necessary to let in such parts of these letters as go to contradict the witness, leaving the proof of the handwriting an open question for the jury; the Court merely saying by this opinion that enough has been proved to warrant the introduction, as far as stated, of the evidence.

The letter of the 12th December, 1844, is collateral, and cannot be read. All the others are dated on or after 8th of May, 1851, and included, except the date of L. F. No. 6, as evidence that the witness was at San Luis Potosi on the 9th and 10th of November, 1851. The date of L. T. No. 11, dated 12th of November, 1851, and the passage in it, "Tell me the exact position of my brother's mines;" and the passage in the letter of the 8th May, 1851, L. T. No. 4, "my brother and I have bought a claim;" the particulars of the three letters are admitted.

It is unnecessary to say how far this evidence ought to be excluded as not rebutting.

May 7th, 1853.

The District Attorney, handing the witness (James R. Partridge) a paper, asked him: Is that the copy of the descriptive portion of the mining in the Alcade's office at Laguinillas, to which you referred on yesterday?

Yes sir.

Describe the appearance of that original paper.

Mr. Bradley: Mr Partridge has already been examined on this subject in the enumeration in chief.

The Court: A witness can only be recalled for the purpose of explanation. The question now is, whether this is or is not rebutting proof.

The Court is of opinion that the witness, having been cross-examined only partially as to seeing the deed, its

appearance, etc., he may be examined, as rebutting evidence, and to meet the testimony adduced by the defendant in reference to the mining title, provided he has anything of that description to say which he has not already sworn to; but it must be confined strictly to the matter of defence; for the rule is that the evidence in reply must bear directly or indirectly upon the subject matter of defence, and ought not to consist of new matter unconnected with the defence, and not tending to controvert or dispute it.  2 Russell on Crimes, 919, 920.  But the witness can say nothing of what the Alcade or officer in charge of the paper communicated to him.   That is pure hearsay.

What has  been adduced by the United States, in chief, must not be repeated.   Witnesses have testified by the week, and if allowed to reiterate, the same circle may be traversed *ad infinitum*, which cannot be permitted.   The evidence to be adduced must conform strictly to the defence, and meet what it has adduced.   Cumulative evidence cannot be heard.

May 20th, 1853.

The jury was called, and after answering to their names was asked by the clerk:  Gentlemen, have you agreed upon a verdict?

The foreman replied, we have not.

The Court:  In reflecting on the case, I have come to the conclusion to discharge you.

You are therefore  discharged.